Reese, J,
delivered the opinion of the court.
The determination of this cause depends upon the legal effect of the terms used in the deed or bill of sale set forth in the pleadings, which is in the following words. (Here the Judge set out the deed as stated in the bill.)
The complainants contend that the above deed vests a life estate only in Agnes Brown, and a remainder in the other complainants, her children, as purchasers; that the words “heirs of the body” in the deed, are to be considered and taken, not as words of limitation, but of purchase. On the other hand, the defendant contends that the words used in the deed'fall within the extent of the rule in Shelly’s case; that if the conveyance had been of real estate, the legal effect of the words under the operation of the rule in Shelly’s case, *231 would have been to vest Agnes Brown, the first taker, with the inheritance in fee tail, which the statute of 1784, ch. 22, sec. 5, would have converted into a fee simple absolute; but that the deed being for personalty, of which an estate tail cannot by law, be limited, the whole interest vested absolutely in Agñés Brown.
Two questions have been discussed, 1st. Will full effect be given to the rule in Shelly’s case in the Courts of Tennessee? 2d. Does the rule extend to and embrace the present case?
The rule in question was considered in the 23d year of the reign of Queen Elizabeth, when upon authority of cases in the year books of the reign of Edward III. and of divers other books, it was held by the Lord Chancellor of England, and all the judges except one of the puisne judges, as an acknowledged and ancient rule of law, “that when the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited, either medi-ately or immediately to his heirs in fee of in tail, that always in such cases, the “heirs of the body” are words of limitation of the estate, and not words of purchase. lCo.R.104. Mr.Preston gives a description or definition of the rule, which Chancellor Kent, a very competent judge of the matter, pronounces to be full and accurate. “When any person takes an Estate of freehold, legally or equitably, under a' deed, will, or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of an intervening estate, of a right of the same legal or equitable character, to his heirs or heirs of his body, as a class of persons to take in succession, the limitation to the heirs entitles the ancestor to the whole estate.” Preston on Estates, vol. 1, p. 263.
As a ground why full effect should not be given in Tennessee, to this rule, it has been argued that it had its origin in the policy of the feudal system, when that system was in full vigor. It is alleged to have been founded upon reasons which have now, even in England, but little strength, and which in the United States never existed, in which the rulo is said not to be in harmony with our institutions; and it is *232 contended that the reasons in which the rule originated having _ ° ° the rule itself should cease with them. The current indeed of professional opinion in England seems to be, that the rule had its origin in feodal policy, the incidents of wardship, primer sei-en, relief, ⅞-c. making estates taken by descent more beneficial to the lord, than estates taken by purchase. It is remarkable, however, that Justice Blacksfone, in his celebrated argument in the case of Perrin and Blake in the Exchequer chamber, says that in no feodal writer did he ever find a single trace of such reason assigned. That learned judge was inclined to believe that it was first established to prevent the inheritance from being in abeyance: One principal foundation for it he says, was to obviate the mischief of too frequently putting the inheritance in suspense or abeyance. Another foundation be said might be, and probably was laid in a principle diametrically opposite to the genius of the feo-dal institutions, namely, a desire to facilitate the alienation of land, and to throw it into the track of commerce one generation sooner by vesting the inheritance in the ancestor, than if he continued tenant for life, and the heir was declared a purchaser. To make this latter reason probable, he cites from the year books, the very first case in which, as he believed, the principle of the rule in Shelly’s case had been established. It is so early as 18 Ed. 2. (fob 577.) where A purchased the manor of F, to hold to himself and wife and his oldest son, and the heirs of the body of the son, and if he died without heirs of his body, then to remain to the right heirs of A, the father. The son died without issue in the father’s life time. The father became bound in a statute merchant and died, leaving another son his heir. To a writ sued out extending the lands of A upon the estate, the sheriff returned that he had delivered all the lands which A had in fee, except the manor of F, in which he had only an estate for term of life. U pon this return it was argued that A took only an estate for life, the fee simple being limited to his heirs, who took by purchase, but the court held the contrary; for this reason among others, because otherwise the fee and the right after the death of the eldest son, would have been in nobody. And Justice Blackstone concludes that the rule was of the highest antiquity, not *233 merely grounded upon any narrow feodal principle, but applied in the very first instance we know of, to the liberal and conscientious purpose of facilitating the alienation of land by charging it with the debt of the ancestor. See Fearne on R. 85, 86. Hargrave’s Law Tracts vol. 1, p. 499, 500.
If the rule were, however, exclusively of feodal origin, its authority would not be thereby diminished, nor would that circumstance justify courts of justice in withholding obedience to it, or in refusing to give to it, its full effect. For as is justly remarked by the same learned judge last referred to, “there is hardly an ancient rule of real property but what had in it more or less of a leodal tincture, but whatever their parentage, they are now adopted by the common law of England, incorporated into its body, and so interwoven into its policy, that no court of justice in the Kingdom had either the power or (he trusted) inclination to disturb them.” Whatever may have been the origin of the rule, or how well soever it may seem adapted to attain the selfish objects, or gratify the grasping cupidity of the feodal lord, it happens to have been obviously based also upon principles of public policy and commercial convenience, sufficiently broad and deep to cause it to survive for the period of near five hundred years, the rage of legislative innovation, and all the changes and fluctuations of the most eventful era of the world, and still to challenge the willing obedience and enlightened support ..of the most learned and able minds of Great Britain and the United States. It is a rule or canon of property, which so far from being at war with the genius of our institutions, or with the liberal and commercial spirit of the age, which alike abhor the locking up and rendering'inalienable real estate and other property, seems tobe in perfect harmony with both. It is owing perhaps' to this circumstance that the rule, a gothic column found among the remains of feodality, has been preserved in all its strength to aid in’ sustaining the fabric of the modern social system.
The statute of entailments, passed in the 13th year of King Edward I. (1285,) commonly called the statute de donis, recites that “where one giveth land to another and the heirs of his body, it seemed very hard to the grantors and their heirs, that their will expressed in the grant should not be *234 observed: instead of which after issue born, the grantee had Power t0 aliene his land, contrary to the mind of the giver, and contrary to the form of the gift.” The statute then ordained, “that the will of the giver, according to the form of the deed of gift manifestly expressed, should be observed, so that those to whom the land was given under such condition shall have no power to aliene the land so given, but if shall remain with the issue of them to whom it was giyen, after their death, or shall revert to the donor or his heirs, if issue fail.”
This statute would have locked up all lands in the Kingdom from creditors, from commerce, and from all the purposes of society. But the fictitious action of common recoveries, and the rule in Shelly’s case afterwards adopted, had some tendem cy to knockoff the fetters created by .this statute. And finally, our statute of 1784, c. 22, § 5, coming in aid of the policy of those fictitious actions and of the rule in Shelly’s case, put an end to the effect and operation of the statute de donis. It recites that, “Whereas, entails of estates tend only to raise the wealth and importance of particular families and individuals, giving them an unequal and undue influence in a republic, and prove in manifold instances, the source of great contention and injustice, be it enacted, &c., that from and after the ratification of this act, any person seized or possessed of an estate m general or special tail, whether by purchase or descent, shall be held and deemed to be seized and possessed of the same in fee simple, fully and absolutely, without any condition or limitation whatsoever, to him, his heirs and assigns for ever, and shall have full power and authority to sell and devise the same as he shall think proper; and said estate shall descend under the same rules as other estates in fee simple.” This statute, like the rule in Shelly’s case, is a rule, not of intention or construction, but of property, and like it has relation not to the wishes of the donor, but to the interests of the community; both alike tend to control individual purpose for the attainment of a public object, namely, the unlocking of property and the subjecting it to the uses ot society.
But if we are mistaken in supposing that the rule in it? intrinsic merits has even more to commend it to the *235 cheerful obedience and entire approbation of the people of the U. States, than to those of Great Britain, where it has been so" uniformly and so staunchly maintained, still, as our ancestors brought the rule with them across the Atlantic, and it formed an element of our colonial law, it must continue until abrogated by statutory enactment to Constitute a portion of our general body of laws, and as much exacts obedience, and must be carried as fully into effect -as any other principle of the common law which we have adopted. If the reasons upon which the rule was originally founded had indeed ceased, it would not follow that the rule itself should likewise cease. For as Mr. Fearne correctly remarks, “whére those things which are the objects of any rule of law cease to exist, there the rule itself must of necessity eease for want of subject matter to relate to, or have any efféctupon; but it by no means follows, that where the same objects of a law still continue, that there the law should cease, only because the very state of things which was the first occasion of it no longer exist. The conclusion is that every rule of law once established continues to be so, whilst the subject of it éxists, until altered by solemn act of legislation.” Fearne on R; 83. Ch. J: Dorseyj 4 Harr, and Johns. R. 431, speaking of the rule in Shelly’s case and of the argument against it now under consideration} very forcibly remarks; “That to disregard rules of interpretation sanctioned by a succession of ages, and by the discussions of the most enlightened judges, under pretence that the reason of the rule no longer exist, or that the rule itself is unreasonable, would not only prostrate the great land marks of property, but would introduce a latitude of construction, boundless in its range and pernicious in its consequences.”
That views so just and enlightened have generally prevailed is shown by the uniform adoption and enforcement of the rule in the courts of the different States of the Union. For which see 4 Kent. Com. 421, &c. and the cases there cited.
We proceed now to enquire whether the terms and limitations of the deed from Elizabeth Strain to Agnes Brown, fall within the extent and operation of the rule in Shelly’s case? If this deed were a conveyance of real estate, the question would be too plain to admit of debate, or to be susceptible of illustra» *236 tion. In its terms it falls literally within the rule. It contains 'a distinct limitation to Agnes Brown for life, with remainder to the heirs of her body lawfully issuing, and in default of such issue, to the grantor or her heirs. We hazard nothing, it is believed, in asserting that no case of a deed or common law conveyance for real estate, with terms similar to those of the deed before us, has by any court in England, been excluded from the extent and operation of the rule in Shelly’s case, from the 'time that rule was adopted up to the present moment.
We have already indicated our opinion that the rule in question is a rule of property and of public policy, not of intention merely, or construction. By this it is not meant to assert that the intention' of the grantor is to be altogether excluded as to the entire instrument, in fixing upon it a construction or interpretation. But it is intended to assert that it matters not how distinctly in point of intention it may appear, that the grantor meant that the first taker should have a life estate only; if it further appear, that by the úse of the terms, heirs' of the body, issue, sons, children, &c., he meant the descendants of the first taker should take, in their character of heirs, a de-scendible estate of inheritance, exhausting the lineal stock of the first taker; such purpose, by operation of the rule, vests' the first taker with the inheritance. In other words, it matters not how strongly or how clearly the grantor may intend that; the instrument should not be controlled by the rule of law; yet if the proper construction of the terms which he has used in the entire instrument bring it within the operation of the’rule of law, the rule of law, and not his intention must have effect. So under our statute of 1784, c. 22, § 5,-it would matter not how clearly the grantor might intend to create an estate tail and not a fee simple, yet the statute which is a rule of property and of public policy, would have effect, against such intention of the grantor, and the estate, in the language of the statute, would be held and deemed, not a fee tail, but a fee simple absolute.
The many vexed qúestions which have from time to time arisen in the application of the rule, and much of the obscurity and apparent contradiction in the decisions of. *237 the courts upon the subject, have probably proceeded from a want of uniform attention to this distinction, or of a just application of it. In wills especially, where intention has always been favorably regarded, and been permitted to exert a controlling influence, the courts have, perhaps, sometimes erfed in not sustaining the rule- with sufficient firmness, against the presence of supposed intention. The general description of circumstances, in cases of wills, that have been allowed to repel the influence of the rule, are thus summed up by Justice Blackstone, in his celebrated argument before referred to, in Perrin vs. Blake, in the Exchequer Chamber. “All the cases that had occurred from the statute of wills to that time, (a period of above two centuries,) in which the heirs of the body had been construed to be words of purchase, were reducible to these four heads; either where no estate of freehold was given to the ancestor, or where no estate of inheritance was given to the heir, or where other explanatory words-were immediately subjoined to the freehold estate; or lastly, where a new inheritance was grafted on the ‘heirs’ of the body.” 1 Harg. Law Tracts, 507. In the deed before us, none of these circumstances occur. Mr. Hargrave, in his able remarks upon the rule in Shelly’s case, 1 Harg. Law tracts 562, 577, says: “If the party entailing meant to build up a succession of heirs on the estate of the tenant for life, he would apply the rule, even though the party should express in his will that the rule should not be applied, and should fur-ther express, that the remainder to the heirs of the tenant for life should operate by purchase.” Mr. Fearne, in commenting upon this observation, remarks, that it might at first glance' be thought to bear against the leading principles in the construction of wills, namely, the intention of the testator; but he adds, upon examination this appears to be only in effect striking the balance between two incompatible intentions; the one' that the whole line of heirs and those only shall take, the oth„er that they shall take by purchase. Fearne on R. 191. In' the case of Perrin vs. Blake, the court of the Exchequer Chamber, in their judgment, struck the balance in the same way, between incompatible intentions. In that case the lim-4 itations were, to A for life, remainder to the heirs of the body *238 of A, remainder to testators daughters for their lives, &'c. And the testator declared it to be his intent that A should not sell or dispose of his estate for a longer term than his life,' and to that intent devised it to A for life, remainder to B and his heirs during the life of A. The court determined that A was tenant in tail, and yet it was beyond all doubt, that the testator intended he should have a life estate only. Mr. Hays, in his essay, remarking upon this case observes, “that it was pending above thirty years, yet the simple question was whether the testator had indicated an intention to designate individuals under the term ‘heirs.’ He unquestionably meant objects to take by purchase, but unless he meant other objects than heirs, A was beyond all dispute, tenant in tail: The superadded declaration was quite consistent with an intention to use the word heirs in its proper sense.”
So also in the case of Jones vs. Morgan, 1. Bro. C. C. 206. The gift was to A for life, without impeachment of waste, to the heirs male of the body of A, severally and respectively and in remainder, the one after the other, as they and every of them shall be in seniority of age and priority of birth, with remainder over. There were powers to A to lease and jointure and charge with portions. All these accumulated circumstances tended strongly to show, indeed left no doubt, that the testator’s intention was, that A should have a life estate only. Yet he was adjudged by operation of the rule, to be tenant in tail, and vested with the inheritance. Lord Chancellor Thurlow, who determined the cause, observes, “It is immaterial that the testator meant the first estate to be an estate for life. I take1 it, that in all cases the testator does mean so. I rest it upon what he meant after-wards. If he meant that every other person who should be his heir, should take, he meant what the law would not suffer him to give, or the heir to take as a purchaser. All possible heirs must take as heirs.”
^ So prevalent is the influence of this general intention when, expressed, that the issue shall take as heirs, that even the word “son”, which is properly a word of purchase, if used so as to prove that the testator meant a class to. take in succession as heirs, will be construed a word of limitation, and vest the in- * *239 heritance in the tenant for life. As in the case of Robinson t vs. Robinson, determined in the House of Lords, 3 Bro. Parl. C. 180. The gift was to A for life, and no longer,! 'provided he took the testator’s name of R, and lived in testa-p tor’s house at B, with remainder to such son as he shall have lawfully to be begotten, taking the name of R, and for default of such issue, then over, &c. The decision was that A was tenant in tail; and the ground of the decision was, that the word son as used, was nomen collectivum, and equivalent to heirs male of the body, which let in the rule in Shelly’s case. Here it was not necessary to take away the force of any technical words of fixed meaning, such as “heirs of the body,” but merely to put a plain construction on the words which the testator had actually used..
So also in the great case of Jesson vs. Wright, 2 Bligh’s Cases in the House of Lords, p. 1. The gift was to A for life, he keeping the building in tenantable repair, to the heirs of the body of A in such shares and proportions as he by deed or will shall appoint, and for want of appointment, then to the heirs of the body of A, share and share alike, as tenants in common, and if but one child, the whole to such child, and for want of such issue, over, &c. It was held in the House of Lords, that A was tenant in tail and vested with the inheritance. In that case, Lord Eldon, then Chancellor, remarks, “if the words children and child, are so to be considered as merely within the meaning of the words “heirs of the body,” which words comprehend them and other objects of the testator’s bounty, (and I do not see what right I have to restrict the meaning of the word ‘issue,’) there is an end of ■ the question. Ido not go through the cases. Upon the whole, I think it is clear that the testator intended that all the issue of the first taker should fail before the estate should go ever according to the final limitation. I am sorry that such a decision is necessary, because when we thus enforce a paramount intention, we enable the first taker to destroy both the general and particular intent. But it is more important to maintain the rules of law than to provide against the hardships of particular cases.” Lord Redesdale, in the same case, in his usual luminous and direct manner remarks, “that it is dan- *240 §erous where words have a fixed legal effect, to suffer them t0 contr°hed without some clear expression or necessary implication. In this case it is argued that the testator did not jmean to use the words ‘heirs of the body,’ in their ordinary legal sense, because there are other inconsistent words. But it only follows that he was ignorant of the effect of the one or of the other. All the cases but Doe vs. Goff, decide that the latter words, unless they contain a clear expression or a •necessary implication of some intent, contrary to the legal import of the former, are to be rejected. That the general intent should overrule the particular., is not the most accurate expression of the principle of decision. The rule is, that technical words shall have their legal,.effect, unless from subsequent inconsistent wo.rds it is very clear that the testator .meant otherwise. Those who decide upon such cases ought not to rely on petty distinctions, which only mislead parties; but look to the words used in the will. The words ‘for want of such issue,’ are far from being sufficient to overrule ‘heirs of the body.’ They have almost constantly been construed to mean an indefinite failure of ‘issue and of themselves, have frequently been held to give an estate tail.”
After the citation of authorities so strong and decisive, it is scarcely necessary to remark, that the words in the deed before the court, “after the determination of that estate, then,” &c., relied on in argument to change the legal effect of the words, “heirs of the body,” from words of limitation to words of purchase, have not the slightest tendency to produce such result. Indeed, it would be doing violence, not only to the fixed and obvious meaning and legal effect of the terms “heirs of the body,” if held in this case to be words of purchase, but to the general intention of the grantor, to be collected from the other portions of the instrument, and arising also from the fact, that Agnes Brown, the first laker, was, at the time the deed was made, not more than two or three years of age, and the grantor therefore would probably look to the heirs of her body as a class to take as heirs, and could hardly be supposed to look to a portion of them, to wit, children living at a particular time, as individuals, the special objects of her bounty. This case indeed, is so clear of all difficulty up *241 on ibo words of the instrument, as not to have merited the attention which has been bestowed upon it, except for the reason that it is the first case in this State, which has distinctly brought up the rule in Shelly’s case for discussion, and the determination of which, must necessarily be placed exclusively upon that rule. It were useless, however, to go further into the cases. They are very numerous and must be familiar to that portion of the profession who have directed their researches into this branch of legal learning. Those cases, too, have received the most severe and elaborate analysis from minds as subtle and powerful as ever adorned the profession, or illustrated the science of law.
But it has been urged that however correct might be the view of the subject which has been taken, if the deed before the court were a conveyance of real estate, yet, as it is for personal property, the rule in Shelly’s case will not apply to it. But by a well settled principle of the common law, the limitation of personal estate to one in tail vests the whole in him. Fearne, on R. 463. In Roper’s Treatise on the Law of Legacies, vol. 2, p. 393, it is laid down as a principle, that if personal estate be given by testament to A, and the heirs of his body, as such words would create an express estate tail in freehold lands, if applied to them,' so in personal estate, if applied to it, such words will have the effect to vest the absolute interest, because such property cannot be entailed, therefore, the first taker will take the absolute interest in the bequest, and the remainder or executory limitations to the heirs of the body, and the subsequent limitations, if any, depending upon the failure of them, will have no. effect. It will make no difference in regard to the construction, that the interest or profits only are given to the first taker, and the principal to the heirs.” This principle is proved by many cases. See Scale vs. Scale, 1 P. Wm. 290, and also, Dod vs.Dickerson, 8 Vin. 451, and the case of Butterfield vs. Butterfield, 1 Ves. Sen. 133, 134. Where a testator by his will devised that ¿6400 should be put out on good security for his son T, that he might have the interest of it for his life, and for the lawful heirs of his body; and if it 'should so'- happen that he should die without heirs, it should go to testator’s youngest *242 eon J. B., Lord Hardwick decided that the whole vested* ftf the first taker, and the limitation over was too remote. In the case of Daw vs. Lord Chatham, 1 Madd. 488; 1 Mer. 278, and 5 Bro. Parl. Ca. 450, the same point is decided, although in that case the devise to the first taker was only of the dividends and payments of stock and annuities, and of the use of furniture during life-. In the case of Chandas vs. Price, 3 Ves. Jr. 99, Lord Eldon remarking upon tfie above case, says, “In Daw vs. Lord Chatham, the whole contemplation of the argument in support of the decree of the Lords Commissioners, was that the rule'in Shelly⅛ case could not apply to' ⅜ bequest purely of personal property. The distinction taken by Lord Talbott in Atkinson vs. Atkinson, 3 P. Wms. 258, that where the words would give an express estate tail', the construction' of law must obtain, bút wheré only an implied estate tail, it should not, was very much labored in Daw vs. Lord Chatham. For in that case there was manifestly art express estate for life, and there were circumstances to show how anxiously the testator endeavored to restrain it to an interest for life; from the manner in which the question was left to the judges, and from some notes, I have concluded that .the distinction is exploded; and that it is to be taken as a general rule, that where the words would raise an estate tail in real estate, they will' give the absolute property in personalty, and if there is no distinct' expression to restrain it to the time the few allows, this consequence must prevail, whatever is the intention.
In the same State, (South Carolina,) in which the'deed of gift before the court was made, and in which the parties to this suit resided until recently, the case of Dott et al vs. Cunnington, 1 Bay’s. R. 447, was decided, founded upon a' deed for personal1 property, in its'terms- véfy like! the present. A special verdict stated, that “Sarah Baker, by deed poll, gave her daughter, Sarah Dott, (wife of David Dott,) sundry ne-groes, &c. distinct from her husband, during life, and at her death to the heirs of her body; that Mrs. Dott then had issue the plaintiff, her eldest son, and several other children, and sOon after her husband, David Dott, died, and she afterwards married John Fyffe, and that after the marriage,- the- said Fyffe *243 and his wife, viz. in 1776, sold part of the negroes in question .to the defendant, Cunnington.” The special verdict-then submits the points of law to the court, whether Mrs. Dott had a life estate only in the negroes, with a limitation over on her death, or whether the whole vested in her at first. ■'The case was fully argued before Rutledge, Ch. J. Burke, Grimke, Waties and Bay justices, who were unanimously of opinion, that the words, “at the death to the heirs of her body,” were words of limitation and not words of purchase; that the court must ,be governed by the plain rules of law, and the legal import of the phrases which constitute an .estate tail, which being too remote and tending to a perpetuity of a chattel, •the whole vested in Mrs Dott the first taker.
There are many other American cases which apply and give effect to the rule in Shelly’s case to devises and conveyances of personal property. Upon the whole, therefore, we feel very clear that the gift from Elizabeth Strain to Agnes Brown for life, with remainder to the heirs of her body, vested the entire interest in Agnes Brown; and therefore, that the statutes of limitation have barred the right of the complainants. The decree of the Chancellor, which dismissed 'the bill, must consequently be affirmed...
.GREEN, J.
I fully concur with the result of the foregoing opinion; but I adhere to the views expressed by me in Loving vs. Hunter, as to the reason an.’ policy of the rule in Shelly’s case.
Judgment affirmed.